UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARGARET KERNSTOCK,

        Plaintiff,                           Case No. 11-11851
                                                Honorable Thomas L. Ludington

v.

UNITED STATES OF AMERICA,

        Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Margaret Kernstock filed this medical malpractice action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1246(b), 2671–80. She alleges Dr. Eventure Bernardino breached the standard of care when he treated her at Health Delivery Systems, Inc. Dr. Bernardino and Health Delivery Systems are employees of the Public Health Service pursuant to the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233 (g)–(n), and therefore this professional negligence claim is properly brought against Defendant United States of America.

This case results from the loss of one of Plaintiff's kidneys. In August 2008, it was discovered that 80% of the renal artery leading to her left kidney was blocked. Plaintiff alleges that Dr. Bernardino should have referred her to a specialist so that her kidney could have been saved. But the evidence shows that any specialist would have advised Plaintiff to do what Dr. Bernardino prescribed: stop smoking, take medication to lower cholesterol, and aspirin to thin the blood. Plaintiff has not established that Dr. Bernardino's failure to refer her to a specialist, who likely would have prescribed the same treatment she was receiving, proximately caused her kidney loss. Defendant's motion for summary judgment will be granted.

**I**

Plaintiff was Dr. Bernardino's patient from 2004 to 2009. Dr. Bernardino is a family physician practicing in Bridgeport, Michigan. He first saw Plaintiff on June 28, 2004. For the first few years of her treatment with Dr. Bernardino, Plaintiff's primary medical issues were high cholesterol and tobacco abuse. During each session, Dr. Bernardino repeatedly counseled Plaintiff to stop smoking.

In late 2005, Plaintiff began having symptoms related to peripheral vascular disease (PVD).[1] Dr. Bernardino ordered an arterial and venous Doppler, which disclosed moderate hemodynamically significant flow reduction in both of Plaintiff's legs — PVD. Dr. Bernardino confirmed that Plaintiff had PVD, explained this to Plaintiff, and recommended that she quit smoking, continue to take aspirin, watch her diet, and exercise regularly.

On December 16, 2006, Plaintiff had another appointment with Dr. Bernardino to discuss her problems with PVD and tobacco abuse. Plaintiff was told that she was at risk "of having more problems with [PVD] because she smokes." Def.'s Mot. Ex. 10, ECF No. 46. This is because smoking is among the top risk factors for medical problems related to narrowed blood vessels. *See* Maheshwari Dep. 12, Pl.'s Resp. Ex. A, ECF No. 54; Boyle Dep. 50–51. So Dr. Bernardino continued to advise Plaintiff to stop smoking. Plaintiff made follow-up visits to Dr. Bernardino in March, April, October, and December 2007. She was repeatedly told, at each appointment, that she needed to stop smoking to avoid complications.

Plaintiff returned to see Dr. Bernardino in May 2008. Dr. Bernardino's appointment notes begin as follows: "I counseled the patient about smoking cessation again. I explained that the first thing she needs to do really is to quit smoking. This has already been emphasized a long

---

[1] PVD involves "a narrowing of the arteries, typically in the legs." Boyle Dep. 23, Pl.'s Resp. Ex. B, ECF No. 54.

time ago. I discussed the strategies of quitting smoking." Def.'s Mot. Ex. 21. Dr. Bernardino also ordered a repeat of the Doppler on the lower extremities to evaluate Plaintiff's PVD. On May 30, 2008, Dr. Bernardino reviewed the results of the second Doppler test with Plaintiff. In addition, Plaintiff "was counseled about smoking cessation again. She has [PVD] and the best thing for her is to quit smoking." Def.'s Mot. Ex. 23.

Dr. Bernardino referred Plaintiff to the Michigan CardioVascular Institute (MCVI) in May 2008 to evaluate her report of lower extremity pain; specifically, discomfort in both legs after walking. On June 17, 2008, Plaintiff was seen by Dr. Alok Maheshwari, an interventional cardiologist at MCVI. At that first appointment, Plaintiff confirmed that despite years of warnings and counseling from Dr. Bernardino, she continued to smoke one pack of cigarettes every day. Def.'s Mot. Ex. 24. Testing indicated that Plaintiff's kidney function was normal.

An ultrasound was conducted on Plaintiff's legs which suggested that both had blockages in the arteries. So a CT angiogram was performed on June 25, 2008. The results confirmed Dr. Maheshwari's suspicion and Dr. Bernardino's earlier assessment — Plaintiff had blocked arteries in both legs. Additionally, there was an incidental note made of a high-grade stenosis in one of her kidney arteries.[2]

After reviewing the results, Dr. Maheshwari recommended Plaintiff undergo an abdominal angiogram, which he performed on August 13, 2008. This second angiogram confirmed the findings of the CT angiogram: Plaintiff had severe disease in both leg arteries with nearly complete occlusion (blockage of the blood vessel). Dr. Maheshwari also confirmed a

---

[2] According to the Merriam-Webster dictionary, stenosis is defined as "a narrowing or constriction of the diameter of a bodily passage or orifice." Merriam-Webster.com, www.merriam-webster/dictionary/stenosis (last visited February 13, 2013). Renal artery stenosis is the "narrowing of one or both renal arteries, so that renal function is impaired." TheFreeDictionary.com, medical-dictionery.thefreedictionary.com/stenosis (last visited February 13, 2013).

blockage of about 80% of Plaintiff's left renal artery.[3] Dr. Maheshwari recommended that Plaintiff have surgery on both the leg arteries to fix the occlusions, but he also determined that the renal artery blockage was not "clinically significant in any way." Maheshwari Dep. 50. Dr. Maheshwari concluded that there was no additional treatment needed for the blocked renal artery: Plaintiff had been informed of her need to stop smoking, she was on a cholesterol-lowering medication, and she regularly took aspirin. According to Dr. Maheshwari, everything that needed to be done to treat the blocked renal artery "was already being done." *Id*. at 51.

Plaintiff had four appointments with Dr. Bernardino after her renal artery stenosis was discovered: October 14, 2008; November 4, 2008; December 2, 2008; and January 19, 2009.[4] During each session, Dr. Bernardino noted Plaintiff's PVD, her tobacco abuse, and he counseled her about quitting. *See* Def.'s Mot. Exs. 29–32. But his notes do not indicate she had been diagnosed with an 80% renal artery stenosis and he did not refer her to a specialist for additional treatment. During the appointment, Dr. Bernardino noted Plaintiff had blood pressure readings of 162/112, and prescribed hydrochlorothiazide to address the issue. When Plaintiff reported stomach aches the next day, Dr. Bernardino called in a prescription for lisinopril instead. After the January 19, 2009 appointment, Plaintiff was scheduled to follow-up after one week. Def.'s Mot. Ex. 32.

On January 21, 2009 Plaintiff was suffering from dizziness, blurred vision, abdomen pain, and episodes of tingling on her left side and right arm. When the dizziness persisted even after she lay down, and she felt nauseas, Plaintiff called 911 and was taken to St. Mary's of Michigan's emergency room by ambulance. At the hospital, Plaintiff indicated she had smoked

---

[3] Despite this fact, Plaintiff's renal function remained normal as of August 12, 2008.
[4] Although it is disputed whether Dr. Bernardino knew of the renal artery stenosis finding, and whether Plaintiff herself knew, for purposes of this motion it has been stipulated that Dr. Bernardino did know, and Plaintiff did not. *See* Def.'s Mot. 5, n.3; Def.'s Mot. 6, n.4.

cigarettes for 32 years but had quit around New Year's, and she also indicated "alcohol intake every day." Def.'s Mot. Ex. 36, at 2.

During Plaintiff's hospital stay, attending physicians noted that she had "a focal 80% stenosis of the left ostial renal artery."[5] *Id.* at 4. She was evaluated by Dr. Peter Fattal, an invasive cardiologist from MCVI. Dr. Fattal knew that Plaintiff "was found to have a focal 80% ostial renal artery stenosis." Def.'s Mot. Ex. 39. But Dr. Fattal did not recommend any treatment whatsoever for what he termed Plaintiff's "mild renal insufficiency." *Id.*

Plaintiff was also seen by Dr. Barbara Pawlaczyk, who indicated Plaintiff had acute renal failure. Dr. Pawlaczyk established that Plaintiff would "be followed out on an outpatient basis to assess her possible need for renal replacement therapy. However at this point, she was fine [sic] doing fine." Def.'s Mot. Ex. 40, at 2. Dr. Pawlaczyk did not recommend Plaintiff undergo a procedure to install a stent, or prescribe any additional treatment for her renal artery stenosis. Dr. Pawlaczyk also indicated that during the evening of January 22, 2009, Plaintiff "called and requested immediate discharge. . . . She insisted on discharge and agreed to sign discharge *against medical advice*." *Id.* (emphasis added).

Plaintiff never returned for the follow-up visit scheduled with Dr. Bernardino after her discharge from the hospital, but instead transferred her care to AGES Senior Health Care. *See* Def.'s Mot. Ex. 41. Plaintiff's subsequent medical records report that on February 20, 2009, she underwent a bilateral renal angiogram. Def.'s Mot. Ex. 42. After the procedure, Plaintiff's attending physician reported that her "Left renal artery is 100% occluded. This is a new finding.

---

[5] It is unclear how this information was known by doctors at St. Mary's — either Plaintiff herself told the doctors, Dr. Bernardino communicated the information, or it was in the system as Dr. Maheshwari conducted Plaintiff's August 13, 2008 abdominal angiogram at St. Mary's. For purposes of addressing Defendant's motion, the question need not be resolved.

Last year left renal artery was 80% stenosed." *Id*. The lack of blood flow to Plaintiff's left kidney caused it to fail.

On April 27, 2011, Plaintiff filed suit against Defendant United States of America pursuant to the FTCA. Her one claim for medical malpractice alleges that Dr. Bernardino breached the standard duty of care because, according to Plaintiff, he did not properly treat her for renal artery stenosis and he prescribed medication that caused further injury and damage to her kidney. Plaintiff contends that Dr. Bernardino "acted negligently in failing to properly treat Plaintiff and in doing so not only failed to comply with the applicable standards of care owed to Plaintiff, but directly and proximately caused Plaintiff's severe and painful injuries resulting in the loss of her left kidney." Pl.'s Compl. ¶ 43, ECF No. 1.

On October 31, 2012, Defendant moved for summary judgment, asserting that, among other things, Plaintiff has failed to establish that any breaches of care on the part of Dr. Bernardino proximately caused her injuries. Defendant also filed a motion challenging the opinions of Plaintiff's sole expert, Dr. Daniel Boyle, M.D.

**II**

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). All justifiable inferences from the evidence are drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is proper where a plaintiff fails to produce evidence creating a genuine issue of material fact as to any of the essential elements of its prima facie case.

*Dietelbach v. Ohio Edison Co.*, 1 F. App'x 435, 437 (6th Cir. 2001) (citing *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995)).

In deciding a medical malpractice claim under the FTCA, a federal court must follow "the law of the place where the act or omission occurred." *Sellers v. United States*, 870 F.2d 1098, 1101 (6th Cir. 1989) (quoting 28 U.S.C. § 1346(b)). Thus, because all of the acts and omissions alleged in this case occurred in Michigan, Michigan state law applies.

In *Craig ex rel. Craig v. Oakwood Hosp.*, 684 N.W.2d 296 (Mich. 2004), the Supreme Court of Michigan stated:

> In order to establish a cause of action for medical malpractice, a plaintiff must establish four elements: (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care.

*Id.* at 308 (citing *Weymers v. Khera*, 563 N.W.2d 647, 652 (Mich. 1997)); *see also* Mich. Comp. Laws § 600.2912. To establish proximate cause, the plaintiff must prove "the existence of both cause in fact and legal cause." *Weymers*, 563 N.W.2d at 652 (citing *Skinner v. Square D Co.*, 526 N.W.2d 457, 479 (Mich. 1994)).

Cause in fact requires "substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Weymers*, 563 N.W.2d at 652 (quoting *Skinner*, 526 N.W.2d at 479). An "act or omission is a cause in fact of an injury only if the injury could not have occurred without (or 'but for') that act or omission." *Craig*, 684 N.W.2d at 309. The Michigan Supreme Court has cautioned that "a plaintiff cannot satisfy this burden by showing only that the defendant *may* have caused his injuries." *Id.* (emphasis in original). So while "the evidence need not negate all other possible

causes," the Michigan Supreme Court "has consistently required that the evidence exclude other reasonable hypotheses with a fair amount of certainty." *Id.* (citing *Skinner*, 526 N.W.2d at 480).

On the other hand, legal or "proximate" cause involves "examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Craig*, 684 N.W.2d at 309 (quoting *Skinner*, 526 N.W.2d at 479). As a matter of logic, "a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries." *Craig*, 684 N.W.2d at 309 (citing *Skinner*, 526 N.W.2d at 479).

### III

To substantiate her claims, Plaintiff offers the opinions and testimony of Dr. Daniel Boyle. Dr. Boyle is board certified in family practice, and he graduated from Georgetown University Medical School in 1973. During the two years that followed, he was enrolled in an OB-GYN residency at Georgetown University Hospital. He does not possess board certification or any areas of specialty related to vascular surgery, and currently is a specialist in family practice.

It is Dr. Boyle's opinion that Plaintiff "lost a kidney" because of what he believes "was a deviation from the standard of care on the part of Dr. Bernardino." Boyle Dep. 9. Dr. Boyle believes that Dr. Bernardino breached the standard of care when he received the results of the imaging study demonstrating an 80% stenosis of the renal artery but did not "make an appropriate referral in order that the patient's renal function could be preserved, that's the first and the major breach." *Id.* at 25–26. According to Dr. Boyle, "[o]n top of that, knowing that the patient had renal artery stenosis I believe was a breach of the standard of care to prescribe, first,

an ACE inhibitor and, second, a diuretic because both of those things can adversely affect renal function in somebody with known renal artery stenosis." *Id*. at 26.

Dr. Boyle is not a specialist who treats renal artery stenosis on a regular basis. In fact, he estimates he has only treated "between five and ten" patients with the disorder in his 38 years of practice. *Id*. at 104. When he does encounter such a patient, he always refers them to a specialist, and he then relies on those specialists "to do whatever they think needs to be done." *Id*. at 11. Despite this lack of experience,[6] Dr. Boyle believes that in cases like Plaintiff's, when "somebody has an 80 percent stenosis of their renal artery, they'd be stented." *Id*. at 10.

Dr. Boyle also opines that had Plaintiff been stented by October 2008, when Dr. Bernardino first learned of the renal artery stenosis, "[Plaintiff] would have had a normal and viable kidney. . . . [which] would be functioning as we sit here today." *Id*. at 102. It must be emphasized, however, that this opinion is not based on Dr. Boyle's medical expertise, but merely his anecdotal observations about a small group of patient referrals. Dr. Boyle testified that after referring patients with renal artery stenosis to specialists, stents were put in place and the patients' kidney function returned to normal. Boyle Dep. 105. Of course, Dr. Boyle made clear that he "absolutely" has not installed any renal-artery stents himself, but instead relies on specialists "to do whatever they think needs to be done." *Id*. at 11, 106.[7]

---

[6] Defendant argues that Dr. Boyle does not have sufficient experience to qualify as an expert in order to provide an opinion about causation or proximate cause. However, the issue need not be decided for purposes of addressing Defendant's motion for summary judgment.

[7] Michigan law requires as follows:

> In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:
>
> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action *in the same specialty as the party against whom or on whose behalf the testimony is offered*. However, if the party against whom or on whose behalf the testimony is offered is a

In its motion for summary judgment, Defendant primarily attacks Plaintiff's evidence of causation. Defendant's argument is sound — assuming for purposes of this opinion that Dr. Boyle is qualified to give the opinions he has — Plaintiff has not satisfied her prima facie burden of showing that any breach on the part of Dr. Bernardino proximately caused her kidney loss.

**A**

As previously discussed, proximate cause requires a showing of cause in fact. Cause in fact requires "substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Weymers*, 563 N.W.2d at 652 (quoting *Skinner*, 526 N.W.2d at 479). An "act or omission is a cause in fact of an injury only if the injury could not have occurred without (or 'but for') that act or omission." *Craig*, 684 N.W.2d at 309.

Dr. Boyle believes that Dr. Bernardino committed two breaches: not referring Plaintiff to a specialist for specific treatment of the renal artery stenosis during any of the four appointments after the problem was discovered, and by his prescription of medications that could exacerbate the situation.

**B**

Dr. Boyle himself testified that Dr. Bernardino's prescription of medication was not a proximate cause of Plaintiff's kidney loss. He was asked if the prescription for the Lisinopril

---

specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.

Mich. Comp. Laws § 600.2169 (emphasis added); *see also Tate ex rel. Estate of Hall v. Detroit Receiving Hosp.*, 642 N.W.2d 346, 348 (Mich. Ct. App. 2002) (noting that "an expert witness must 'specialize[] at the time of the occurrence that is the basis for the action' in the same specialty as the defendant physician."). Stated previously, it will not be determined whether Dr. Boyle can actually provide the opinions he has. However, the Court notes that it is unlikely Dr. Boyle, a general practitioner, could competently give his opinion on the standard of care in this case where he is not a specialist in the area involved, i.e. renal artery stenosis. Dr. Boyle testified he always refers patients with renal artery stenosis to specialists for care, and Defendant has offered such a specialist who indicates Dr. Bernardino's care was what he would have recommended. Nevertheless, because Plaintiff's motion fails even when considering Dr. Boyle's opinion, there is no need to decide the question.

(the ACE inhibitor) or the hydrochlorothiazide (the diuretic) attributed to further stenosis of Plaintiff's renal artery. He responded as follows:

> No. *I don't think either the Ace or the diuretic had anything to do with the further stenosis*, but I think that the ACE inhibitor can cause problems in people with renal artery stenosis, and I think a diuretic, by shrinking the vascular volume, could also contribute to worsening renal failure with renal artery stenosis, but the elephant in the room is the renal artery stenosis. That's what caused the problem.

Boyle Dep. 32 (emphasis added). So while the Court accepts as true, for purposes of addressing this motion only, that Dr. Boyle is qualified to provide his opinion that Dr. Bernardino breached the standard of care when he prescribed certain medications, it is clear that Plaintiff has furnished no evidence that this breach proximately caused her kidney loss. In fact, Plaintiff's only expert established that the prescription of these medications had nothing to do with furthering Plaintiff's problems. As Dr. Boyle established, it is his belief "that the renal artery stenosis being untreated caused the renal failure." *Id*. at 31.

Plaintiff argues that this testimony is mischaracterized because Dr. Boyle went on to testify:

> These other things could have exacerbated the problem and, to a degree, did with the lisinopril and then the hydrochlorothiazide, but I'm not saying that they – that the hydrochlorothiazide caused anything. I'm just saying that it was a breach of the standard of care to prescribe something that would shrink your inner vascular volume in somebody with known renal artery stenosis, but again, the real issue is fix the renal artery stenosis.

*Id*. at 32–33. Even if the first sentence of Dr. Boyle's testimony — that the medication "could have exacerbated the problem and, to a degree, did" — was construed as Dr. Boyle's affirmative opinion that the medication caused Plaintiff's kidney loss (in spite of his opinion that the hydrochlorothiazide did not cause anything), this is not "substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries

- 11 -

would not have occurred." *Weymers*, 563 N.W.2d at 652 (quoting *Skinner*, 526 N.W.2d at 479). Plaintiff has not provided any evidence demonstrating that a dose of lisinopril is sufficient to cause stenosis in Plaintiff's renal artery. Further, Dr. Boyle affirmatively established that it was his opinion, only a short time before, that neither the ACE inhibitor nor the diuretic had anything to do with Plaintiff's further stenosis; that it was the "untreated" renal stenosis that caused the occlusion and subsequent kidney failure. Summary judgment is warranted on this alleged breach because Plaintiff has not met her burden of demonstrating substantial evidence that any prescribed medication was a proximate cause of her harm.

## C

Likewise, Plaintiff has not established sufficient evidence to show that Dr. Bernardino's failure to refer Plaintiff to a specialist proximately caused her subsequent kidney loss. Again, the following bears emphasis: Plaintiff must demonstrate with substantial evidence that had Dr. Bernardino referred Plaintiff to a specialist, her kidney would have been saved.

As repeatedly emphasized by the Michigan Supreme Court, "a causation theory must have some basis in established fact. However, a basis in only slight evidence is not enough. Nor is it sufficient to submit a causation theory that, while factually supported, is, at best, just as possible as another theory." *Skinner*, 516 N.W.2d at 480. Plaintiff offers no factual evidence to support Dr. Boyle's conjecture that had Plaintiff been referred to a specialist, that specialist would have done anything differently than Dr. Bernardino. Plaintiff's offered proof of causation here is simply "mere speculation," and will not suffice. *See id*.

Dr. Boyle believes that patients with 80% renal artery stenosis who are referred to specialists are stented, and therefore concludes that this would have occurred had Plaintiff been referred to a specialist. Boyle Dep. 10. Dr. Boyle opines that such a stent would have saved

Plaintiff's kidney, because the five to ten patients with renal artery stenosis he has referred to specialists were stented and their kidney function returned to normal. *Id*. at 106.

But Dr. Boyle is no specialist in the area of renal artery stenosis. He acknowledges that he has never treated a patient for renal artery stenosis in his 38 years of practice. Whenever he encounters renal artery stenosis, he refers the patient to a specialist — who knows how to treat the disorder — and then relies on whatever medical determination the specialist deems appropriate. Further, there is no indication that the patients Dr. Boyle referred, and who subsequently recovered their kidney function after stenting, were in any way analogous to Plaintiff. Those patients may have presented a host of different risk factors. They may not have continued smoking for years despite doctors warning them to stop. Dr. Boyle is simply making a series of assumptions that, as he testified, concern both a disorder and a patient he has never treated himself. This is not sufficient evidence to demonstrate that had Plaintiff been referred to a specialist, that specialist would have installed a stent which would have saved Plaintiff's kidney.

As the Michigan Supreme Court established in *Craig*, Plaintiff cannot satisfy her burden of proving proximate cause,

> by showing only that the defendant *may* have caused [her] injuries. Our case law requires more than a mere possibility or a plausible explanation. Rather, a plaintiff establishes that the defendant's conduct was a cause in fact of [her] injuries only if [she] sets forth specific facts that would support a reasonable inference of a logical sequence of cause and effect. A valid theory of causation, therefore, must be based on facts in evidence. And while the evidence need not negate all other possible causes, this Court has consistently required that the evidence exclude other reasonable hypotheses with a fair amount of certainty.

*Craig*, 684 N.W.2d at 309 (internal quotation marks, brackets, and citations omitted). Plaintiff has not ruled out, "with a fair amount of certainty," that a specialist would have prescribed the same treatment as Dr. Bernardino.

Dr. Maheshwari is the very type of specialist that Dr. Boyle relies on to treat patients with renal artery stenosis: an interventional cardiologist "that specializes in doing angiograms and, you know, if need be, fixing the arteries, doing angioplasty or stents in addition to the other cardiology work." Maheshwari Dep. at 5-6. Dr. Maheshwari saw Plaintiff in August 2008, and he was aware of the 80% renal artery stenosis. He expressly indicated the treatment he would have recommended to treat Plaintiff's renal artery stenosis: nothing that was not already being done by Dr. Bernardino. So even if Dr. Bernardino had referred Plaintiff to a specialist like Dr. Maheshwari, the evidence indicates it is more likely than not the recommended treatment would have been exactly what Dr. Bernardino prescribed: stop smoking, take aspirin, and medicate the high cholesterol.

Plaintiff contends that this is a mischaracterization of Dr. Maheshwari's testimony. Plaintiff emphasizes that according to Dr. Maheshwari, it was up to Dr. Bernardino to take whatever action he deemed appropriate to treat Plaintiff's renal artery stenosis, and that Dr. Maheshwari was treating Plaintiff for other issues. While this is true — Dr. Maheshwari was not treating Plaintiff for renal artery stenosis — he did provide his opinion as to what he would have recommended if he had been.

Dr. Maheshwari testified that smoking was the greatest risk factor for arthrosclerosis.[8] Maheshwari Dep. 12. He went on to establish that along with smoking; hypertension, diabetes, and elevated cholesterol levels are the "risk factors that need to be addressed" when dealing with sclerosis, and "that's essentially the medical treatment." *Id*. According to Dr. Maheshwari, and contrary to Dr. Boyle's testimony, putting a stent in the renal artery is "rarely, rarely necessary for renal artery stenosis." *Id*. In his opinion, because Dr. Bernardino had placed Plaintiff on

---

[8] "A condition where fatty deposits cause the arteries to narrow." TheFreeDictionary.com, medical-dictionery.thefreedictionary.com/arthrosclerosis (last visited February 13, 2013).

aspirin, a cholesterol-lowering medication, and advised smoking cessation, Dr. Maheshwari "did not see a reason to do anything more than what [was] being done." *Id.* at 50–51. The opinion of Plaintiff's expert — who does not treat patients with renal artery stenosis himself but refers them to specialists and then relies on their opinions — is not the sufficient evidence to "exclude other reasonable hypotheses with a fair amount of certainty" as required by the Michigan Supreme Court in medical malpractice actions. *Craig*, 684 N.W.2d at 309. It is more likely that even if Dr. Bernardino referred Plaintiff to a specialist, the treatment he prescribed would have been approved. Plaintiff has not satisfied her burden of demonstrating that but for Dr. Bernardino's failure to refer her, she would not have lost her kidney.

This conclusion is supported by the fact that while Plaintiff was in the hospital on January 22, 2009, she was evaluated by Dr. Fattal, another invasive cardiologist from MCVI. Noted above, Dr. Fattal knew that Plaintiff had 80% renal artery stenosis but did not recommend any treatment whatsoever for what he termed to be "mild renal insufficiency." Def.'s Mot. Ex. 39. This was three days after Plaintiff's final visit to Dr. Bernardino.

Plaintiff argues that Dr. Fattal's lack of treatment for Plaintiff's renal artery stenosis is not surprising, because "recommendations are not made regarding conditions which are outside the scope of the referral," and Dr. Fattal was evaluating Plaintiff's cardiovascular health. Pl.'s Resp. 16 (citing Maheshwari Dep. 99–104). But Dr. Fattal's decision not to prescribe additional treatment for Plaintiff's renal artery stenosis does not stand alone. Instead, when considered with Dr. Maheshwari's opinion that he would not recommend any treatment that was not already being done, it is powerful circumstantial evidence that even had Plaintiff been referred by Dr. Bernardino to a specialist, her treatment would have remained the same.

Plaintiff has not satisfied her burden, on either alleged breach of the standard of care, of demonstrating Dr. Bernardino proximately caused her kidney loss. Summary judgment on behalf of Defendant is therefore appropriate.[9]

**IV**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 46, is **GRANTED**.

It is further **ORDERED** that Plaintiff's complaint, ECF No. 1, is **DISMISSED** with prejudice.

It is further **ORDERED** that Defendant's motion to challenge expert testimony, ECF No. 48, is **DENIED** as moot.

Dated: February 26, 2013                    s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 26, 2013.
                        s/Tracy A. Jacobs
                        TRACY A. JACOBS

---

[9] Defendant also alleges that Plaintiff's comparative negligence was greater than 50% and that she is therefore not entitled to non-economic damages. Def.'s Mot. 19–20. However, because summary judgment will be granted on Plaintiff's failure to demonstrate proximate cause, this issue will not be addressed.